IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **TRINITY F. SIMPSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 23-00441-KD-C |
| | ) | |
| **CSL PLASMA,** | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

Trinity Simpson worked for CSL Plasma as a phlebotomist. Approximately seven weeks after she informed her supervisor that she was pregnant, she was terminated. Simpson claims she was fired because she was pregnant and had inquired about maternity leave. CSL Plasma denies this assertion and contends that Simpson was fired for recording a conversation in violation of CSL policy.

This action is before the Court on Defendant CSL Plasma's Motion for Summary Judgment, (Docs. 20, 24), Plaintiff Trinity F. Simpson's Response, (Doc. 26), CSL Plasma's Reply, (Doc. 27), and the evidentiary material therein. Because there are material issues of fact in dispute as to all claims, CSL's Motion for Summary Judgment is **DENIED.**

    **I.**    **Facts**[1]

        **a. Simpson's Hiring, Chain of Command and Relevant CSL Policies**

CSL Plasma ("CSL") is a plasma collection facility. In February 2021, CSL hired Trinity Simpson ("Simpson") as a phlebotomist. Simpson's direct supervisor was Assistant Center Manager Britta Jones ("Jones"). Simpson was promoted to Group Lead after receiving high

---

[1] Facts are recited in a light most favorable to Simpson.

1

marks on her evaluation from Jones in May 2022. (Doc. 25-2 at p. 6-7). Jones was involved in Simpson's hiring, promotion to Group Lead and the decision to terminate Simpson's employment. Jones' direct supervisor was Center Manager Wesley Stokes ("Stokes"), and Stokes reported to the Associate Director of Operations John Hunt ("Hunt"). The Center Supervisor was David Pineda ("Pineda"), but his responsibilities did not include disciplinary authority over the employees. The Employee Relations Manager Donna Newman ("Newman") worked remotely for the Center.

CSL has a strict policy on recording and wiretapping. (Doc. 21-5 at p. 81). CSL's policy reads: "CSL employees are prohibited from recording or wiretapping (video, cell phone, etc.) which records the conversations of employees, donors, vendors, etc., while on CSL premises, except where such recording is protected under applicable law." (Id.). Newman testified that even if the state law recording policy is not violated, CSL's recording policy can still be violated. (Doc. 21-5 at p. 22-23).

CSL's leave decisions are governed by a third party – Lincoln Financial. (Doc. 21-5 at p. 12-13). CSL's absence policy regarding the Family and Medical Leave Act states: "information on local, state or Federal mandated FMLA Leave of Absences is posted at each facility and also available on the Company Intranet. Employees may also contact their manager or Human Resources for further details." (Doc 23-1 at p. 5).

### b. Simpson's Pregnancy

In the middle of February 2023, Simpson learned she was pregnant. (Doc. 1 at p. 3). Soon after, Simpson informed Jones of her pregnancy. (Doc. 25-2 at p. 7-8). When Simpson informed Jones of the pregnancy, Jones asked her when she was due, and then told Simpson she "had a long way to go" after hearing Simpson's due date was months later. (Doc. 25-1 at p. 18-19).

Simpson testified that she asked Jones about maternity leave, but Jones told her it was "too early to be worrying about that." (Doc. 25-1 at p. 6). Simpson states that she searched the intranet once to look up how to apply for leave, but could not figure it out. (Doc. 21-1 at p. 9).

Simpson began experiencing some side effects of pregnancy, so her doctor gave her written recommended work restrictions. (Doc. 21-1 at p. 12-13). The guidance given was general advice of what to avoid in pregnancy, such as not lifting heavy items or bending.  Her doctor also recommended sitting and taking breaks as necessary. (Id.). Simpson talked with Jones about these recommendations with the written guidance in her hand. (Id.). Simpson claims that Jones did not ask for a copy of the guidance. (Id. at p. 13-14). Newman testified at deposition that Jones was responsible for either taking the guidance from Simpson to give to Human Resources or telling Simpson to provide the guidance to Human Resources. (Doc. 25-5 at p. 3, 20).

During her pregnancy, Simpson regularly asked her coworkers for assistance with work tasks like lifting heavy boxes or going on the donor floor in her place when she needed a break. (Doc. 25-1 at p. 8; Doc. 25-2 at p. 8-9; Doc. 25-11 at ¶ 8). Gere Roehrig and J'Vaughn Briscoe, two senior phlebotomists, often helped Simpson when she need it. (Doc. 25-11 at ¶ 8; Doc. 25-12 at ¶ 5; Doc. 25-13 at ¶ 2, 14-16).

Simpson claims that Jones became annoyed with the work accommodations Simpson utilized while pregnant and that Jones' annoyance was noticeable to other employees. (Doc. 25-1 at p. 16-17; Doc. 25-11 at ¶ 9; Doc. 25-13 at ¶ 9, 14-16). Specifically, Roehrig observed Jones rolling her eyes at Simpson when she would seek assistance on lifting boxes. (Doc. 25-13 at ¶ 14). Briscoe claims that Jones reprimanded Simpson for leaving the floor too often and that other employees were not treated the same way. (Doc. 25-3 at p. 7-8) Briscoe also testified at deposition that after Simpson was promoted to Group Lead, Simpson was often called into Jones

or Stokes' office for a private meeting and would inform Briscoe of what occurred in the meeting. (Id.). Assistant Manager of Quality Ryan Bieller once walked by Simpson when she was sitting on the donor floor and told her not to sit while on the floor. (Doc. 21-1 at p. 47-51). A few days later in a group meeting, Jones informed the phlebotomists of a new rule that no one needed to sit on the donor floor. (Id. at p. 49-52). Simpson, Roehrig, and Briscoe believed this new rule to be directed at Simpson as she was the only phlebotomist who regularly sat on the donor floor. (Doc. 25-13 at ¶ 15; Doc. 25-1 at p. 15; Doc. 25-3 at p. 5). Briscoe also claims to have overheard Jones state that Simpson's pregnancy was an inconvenience for the Center. (Doc. 25-3 at p. 4). In the middle of March during an informal gathering between Roehrig, Jones, Simpson, and Briscoe, Jones stated that she would not have hired the Center's new receptionist if she knew she was pregnant. (Doc. 21-1 at p. 38-40). Simpson did not know whether Jones had input on the receptionist's hiring. (Id.). Roehrig stated she recorded this meeting with Jones' comment (Id. at p. 59-60).[2]

    **c. March 16th Parking Lot Incident**

On March 16, 2023, Roehrig took Simpson's place on the donor floor so that she could take her lunch break after feeling some nausea. (Doc. 25-1 at p. 20-21). While Simpson was in her car during her lunch break, she overheard employee Artelia Cook and donor Brandon Scott in an argument. (Id.). Scott was there to pick up Roehrig who was his girlfriend. (Id. at p. 22). Once Simpson realized the argument was threatening in nature, she went inside the Center to find a manager to help de-escalate the situation, as Simpson believed she could not do so herself. (Id. at p. 20-21). The only manager currently there was Pineda. (Id. at p. 23). Pineda told

---

[2] CSL contends that no such comment appears on the recording and has submitted a transcript as proof.

4

Simpson he could not handle it because he was required to be on the donor floor at that moment. (Id.). Simpson then told Roehrig that she could leave since Simpson was clocking back in and there was a "situation" between Cook and Scott in the parking lot. (Id. at p. 23-24). Simpson returned to the parking lot for a few minutes where Cook and Scott were no longer in an argument. (Id. at p. 24). Then Roehrig and Scott left the Center. (Doc. 21-1 at p. 102)

Later that same day, Simpson's nausea had not subsided, so she went back to her car for a break. (Doc. 25-1 at p. 25). Simpson called Roehrig when she got in her car to see if Roehrig would bring her something to ease her nausea. (Id.). Cook walked out of the Center and Roehrig could hear Cook talking angrily on the phone to someone. (Id.) Simpson claims that when Cook saw her in her car, Cook began speaking louder saying she was going to come after Roehrig's family. (Id.) Roehrig then asked Simpson to record Cook's conversation, but Simpson did not record the conversation. (Id. at p. 26). Simpson states that Roehrig told her to stay quiet on the phone, and Simpson complied. (Id.). Roehing then recorded Cook's side of the conversation. (Doc. 25-13 at ¶ 22).

After the phone call, Simpson went back inside and asked Briscoe if he would be alright if she left for the night since she was still feeling sick. (Doc. 25-1 at p. 26). In the meantime, Roehrig and Scott filed a police report based regarding the recorded conversation and met the police at the Center. (Doc. 25-13 at ¶¶ 23-24, 26-27) Scott and Roehrig also spoke with Jones about what happened. (Doc. 25-13 at ¶¶ 28-29). While Roehrig was speaking to Jones, Roehrig told Jones she recorded Cook's conversation. (Id. at ¶ 28). Jones asked Roehrig to send her the recording and Roehrig sent it through Facebook. (Id.). However, Jones testified that Roehrig did not state she recorded the call. (Doc. 25-2 at p. 15-16). Jones stated that Scott told her that Simpson had sent the recording to him after he asked her to record the call. (Doc. 25-2 at p. 21-

22). Jones admits that she did not directly ask Simpson or Roehrig who recorded the conversation. (Id. at p. 21).

### d. Jones' Investigation into the March 16th Incident

On the evening of March 16, 2023, Jones called Newman to inform her of the incident. (Id. at p. 12). Newman told Jones to begin gathering statements from those involved. (Id.). Jones asked Simpson and Roehrig to write a statement about the incident with no specific instructions of what to include. (Doc. 25-1 at p. 27; Doc. 25-11 at ¶ 14; Doc. 25-13 at ¶ 29). Jones also told Roehrig to have Scott write a statement. (Doc. 25-13 at ¶ 29). Jones informed Roehrig she would receive discipline if she spoke to anyone about the situation. (Id.).

On March 17, 2023, Jones wrote her statement about the events of the previous day. (Doc. 25-7 at p. 2). Jones did not include her conversation with Scott in her statement. (Id.). After the investigation, Cook was terminated from the Center after admitting to making threats to Scott. (Doc. 25-2 at p. 39).

At the beginning of April, Newman received an email from Cook that raised concerns about Roehrig and Simpson, and indicated that Newman wanted to reopen the investigation. (Doc. 25-2 at p. 43). Jones then emailed Newman back stating that Simpson was part of the situation, and she desired to give Simpson the "highest level of corrective for her." (Id. at p. 22, 42). Jones also reported in that email that Roehrig's actions were simply a response to Simpson's information and actions. (Id. at p. 42). Roehrig was never disciplined or terminated for her actions. (Doc. 25-13 at ¶ 31).

Stokes learned about the incident verbally from Jones or through the written statements Jones acquired. (Doc. 25-4 at p. 6). Stokes and Jones then spoke with Hunt about the incident, Simpson's actions and whether Simpson violated the recording policy. (Id. at p. 9). Hunt then

6

approved Simpson's termination. (Id. at p. 9-10). Newman also only knew of the incident from Jones and the written statements. (Doc. 25-5 at p. 7-9). Newman stated that Jones was insistent that Simpson was the one who recorded the conversation. (Id. at p. 6). Newman stated that Simpson's actions in totality on March 16th led to her termination. (Id. at p. 14).

Simpson learned of her termination on April 14, 2023, in a meeting with Jones and Bieller. (Doc. 25-14 at p. 4). Simpson was informed that her termination was based on breaking Alabama law and violating the recording policy. (Id. at p. 3).

### e.  Roehrig as a Comparator

Roehrig and Simpson were phlebotomists on the Leadership Team at CSL. (Doc. 25-13 at ¶ 2). Roehrig was hired by CSL in October 2021. (Id.). Although Roehrig was involved in the March 16th situation and other altercations with donors, Roehrig was not disciplined. (Id. at ¶ 31). Roehrig had been previously coached on bringing conflicts to management and for attendance issues. Roehrig previously received a high-performance evaluation. (Id. at ¶ 3). Roehrig did not claim to be pregnant or request FMLA leave for pregnancy while an employee at CSL. (Id. at ¶ 33).

### f.  Procedural History

Simpson filed a complaint with the Equal Employment Opportunity Commission on September 11, 2023. (Doc. 25-13 at ¶ 32). CSL claims that Simpson filed her complaint with the EEOC based on reasons other than pregnancy discrimination, i.e. because she reported illegal substance abuse on the CSL's premises. (Doc. 21-1 at p. 107-08) However, Simpson's charge of discrimination also alleges that she "was discharged because of my race and pregnancy." (Id.) On September 14, 2023, the EEOC issued a Determination and Notice of Rights. (Doc. 25-9) Simpson filed her Complaint in this action on November 20, 2023. (Doc. 1).

## II. Standard for Summary Judgment

Summary judgment is granted in a case when "there is no genuine dispute of fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material when it could alter the outcome of the case. Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1455 (11th Cir. 1997) (citing Anderson at 248).

Summary judgment functions to discard claims or defenses that are not adequately supported by the facts. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). One purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see if there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e).

A genuine issue for trial is nonexistent when a reasonable jury would not be able to find for the nonmoving party based on the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. 475 U.S. 574, 587 (citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). Although the facts are viewed in the most favorable light to the nonmoving party, the nonmoving party bears the burden of designating specific facts to show that a genuine issue to be solved at trial exists. Id. The nonmoving party must establish more than doubt regarding the material facts to proceed to trial. Id. at 586 (citations omitted). An alleged factual dispute will likewise be insufficient to establish a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Therefore, when the moving party meets their burden and the nonmoving party does not convincingly show a dispute of the facts, the motion for summary judgment shall be granted. Fed. R. Civ. P. 56(a).

### III. Analysis

**A. Count I – Title VII Pregnancy Discrimination Claim**

Title VII of the Civil Rights Act prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a). "The terms "because of sex" or "on the basis of sex" include…pregnancy." 42 U.S.C. §2000e(k). Because pregnancy is included as a term in "on the basis of sex," the analysis for pregnancy discrimination is the same analysis as sex discrimination. Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308 (11th Cir. 1994) (citing Maddox v. Grandview Care Center, Inc., 780 F.2d 987, 989 (11th Cir. 1986)). To prove pregnancy discrimination, a plaintiff may utilize direct or indirect evidence. Chavez v. Credit Nation Auto Sales, LLC, 641 F. App'x 883 (11th Cir. 2016). "Direct evidence is evidence that proves the existence of a discriminatory motive to terminate without inference or presumption. Indirect evidence is circumstantial evidence." Id. at 884 (citations omitted). When a plaintiff is utilizing circumstantial evidence, she can prove pregnancy discrimination on summary judgment by the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. at 885.

The burden shifting framework established by the Supreme Court in McDonnell Douglas first requires the plaintiff to prove a prima facie case of their Title VII claim. 411 U.S. at 802. The burden then shifts to the defendant to show a valid, nondiscriminatory reason for the adverse employment action experienced by the plaintiff. Id. Lastly, the burden shifts back to the plaintiff to show existing pretext to the employer's action. Id. at 804.

**1. Simpson's Prima Facie Case**

When establishing a prima facie case, a plaintiff must show that (1) they are in a protected class, (2) qualified to do their job, (3) subjected to an adverse employment action, and (4) a similarly situated employee did not receive the same treatment. Holland v. Gee, 677 F.3d 1047,

9

1055 (11th Cir. 2012) (citation omitted). Here, it is undisputed that Simpson was part of a protected class as a pregnant person, qualified to do her job[3], and experienced an adverse employment action of termination of her employment. Thus, the only element Simpson needs to prove to establish a prima facie case is that a similarly situated employee did not receive the same adverse action as she experienced.

A proper comparator is an individual who is similar to the plaintiff "in all material respects." Lewis, 918 F.3d at 1226-27. A person is similarly situated with the plaintiff if they engaged in similar conduct, are subject to the same employment policies, have the same supervisor or have similar employment or disciplinary history. Id. at 1227-28.

Simpson's closest comparator is Gere Roehrig. Roehrig was a senior phlebotomist with Simpson at CSL. (Doc. 25-13 at ¶ 2). Roehrig began working for CSL in October 2021 and received a promotion to senior phlebotomist in May 2022. (Id.). Roehrig's supervisor was Britta Jones, and the Center Manager was Wesley Stokes during her employment with CSL. (Id. at ¶ 5). While Roehrig was employed with CSL, she did not claim to be pregnant, request accommodations associated with pregnancy nor request FMLA leave. (Doc. 25-13 at ¶ 33). Roehrig received a great evaluation score on her yearly evaluation in June 2022. (Id. at ¶ 3).

During the events of March 16, 2023, Roehrig was an active participant. According to Roehrig and Simpson, Roehrig was the one who requested Simpson record Cook speaking on the phone, and Roehrig admits to making the recording after Simpson said she could not. (Id. at ¶ 22). Roehrig and Scott were the ones who called the police to come to CSL based off Cook's threatening language Roehrig overheard on the phone. (Id. at ¶ 24). According to Roehrig, she

---

[3] Simpson received a score of "4" on her yearly evaluation in May 2022. (Doc. 25-2 at p. 31). Jones testified that the scores range from one to five, and that she has never given a score of five. (Id. at p. 6-7).

10

told Jones that she recorded the conversation and Jones requested Roehrig to send her the recording, and Roehrig states that she did. (Id. at ¶ 28). Roehrig wrote a statement based on the events of that day following Jones' request. (Id. at ¶ 29). Moreover, after Newman suggested reopening the case to see if Roehrig was an instigator in the events, Jones only recommended Simpson for termination. (Doc. 25-2 at p. 42-43). Even though Roehrig had disciplinary action in the past, Roehrig was not disciplined in any way for her participation in the events on March 16, 2023. (Doc. 25-13 at ¶ 31). Further, Roehrig previously recorded a conversation of a work meeting in violation of the Recording Policy and did not receive any form of discipline. (Id. at ¶ 18). Because of this, Roehrig is an adequate comparator "in all material respects" and Simpson has established a prima facie case of discrimination. Lewis, 918 F. 3d at 1226-27.

### 2. CSL's Valid, Nondiscriminatory Reason for Simpson's Termination

Next, the burden shifts to CSL to prove there was a legitimate, nondiscriminatory reason for Simpson's termination. Simpson concedes that CSL is able to meet this burden since CSL states their reasoning for terminating Simpson's employment was based on a violation of the Recording Policy in the Employee Handbook. (Doc. 26 at p. 18-19).

### 3. Pretext

Lastly, the burden shifts again to Simpson to show evidence that CSL's stated reason for her firing is pretext, and the real reason was because she was pregnant. To establish a pretextual reason for an adverse employment action, the employer's independent reason for the action must be shown to be false and that discrimination was the true reason. Akridge v. Alfa Ins. Companies, 93 F.4th 1181, 1196 (11th Cir. 2024) (quotation omitted). The burden to prove pretext rests on the plaintiff and must be proved by significant probative evidence to avoid summary judgment. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).

11

"This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Owens v. Georgia Governor's Off. of Student Achievement, 52 F.4th 1327, 1338 (quoting Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)) (internal quotations omitted). When the employer has provided a legitimate, reasonable reason for the action, the plaintiff must meet the reason head on and rebut it. Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotations omitted).

Simpson provides several instances of behavior, specifically committed by Jones, that is evidence that CSL's stated reason could be viewed as pretextual. For instance, Simpson claims that Jones disfavored pregnant employees which is shown in Jones' alleged comment about Simpson's pregnancy not being good for the center, Jones' comment that she would not have hired the receptionist if she knew the receptionist was pregnant and Jones' perceived attitude toward Simpson's work accommodations requests for her pregnancy. (Doc. 26 at p. 19-20). Jones' alleged bias against pregnant employees is also supported by testimony from Briscoe and Roehrig who claim that Jones visibly showed an attitude toward Simpson when she needed pregnancy accommodations such as sitting on the donor floor or needing someone to move boxes in her stead. (Doc. 25-11 at ¶ 4; Doc. 25-12 at ¶ 4; Doc. 25-13 at ¶ 9).

Next, Simpson's claim of intentional discrimination based on her pregnancy is supported by how Roehrig was treated differently for similar actions. (Doc. 26 at p. 20-23). This is especially

12

true in light of the evidence that Jones chose to ignore Roehrig's confession to recording the conversation. (Id. at p. 23).

CSL argues Jones acted on a good faith belief that Simpson made the recording when recommending her for termination, even if this was incorrect. (Doc. 24 at p. 21-22) CSL quotes the 11th Circuit's finding that an employer who has a mistaken yet honest impression as a reason for firing an employee has not acted in a discriminatory manner as its reasoning. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999); East v. Clayton Cnty., 436 F. App'x 904, 912 (11th Cir. 2011). The problem with this argument is that Simpson's evidence would allow for a reasonable jury to find that Jones did not have a good faith belief that Simpson violated the recording policy.

As to CSL liability, Simpson relies on a "Cat's Paw" theory of liability (Doc. 26 at p. 25). The Cat's Paw theory is invoked when a plaintiff establishes that a decisionmaker followed a biased recommendation and did not investigate the complaint against the employee independently. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). "[T]he plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331. Simpson alleges that since Jones was the sole investigator into the events of March 16th and the decisionmakers, Newman and Hunt, acted solely on her recommendations, then the Cat's Paw theory applies. (Doc. 26 at p. 25). The Court agrees.

In sum, the Court finds that in viewing the facts in the light most favorable to Simpson, a genuine issue of material fact exists and that a reasonable factfinder could infer CSL's reason for

13

terminating Simpson's employment is pretext for pregnancy discrimination. Therefore, Defendant's Motion for Summary Judgment on this claim is **DENIED**.

### B. Counts II and III - FMLA Claims of Retaliation and Interference

#### 1. Count II – FMLA Retaliation Claim

Simpson claims that she was retaliated against based on her alleged FMLA request for maternity leave. FMLA retaliation claims are analyzed through the McDonnell Douglas burden-shifting framework as used supra. Smith v. BellSouth Telecommunications, Inc., 273 F.3d 1303, 1314 (11th Cir. 2001). A plaintiff establishes a prima facie case of FMLA retaliation by proving (1) engagement in a statutorily protected activity, (2) an adverse employment action, and (3) a causal connection between the protected activity and the adverse action. Id. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to show an unrelated, valid reason for the adverse action, and then the burden shifts back to the plaintiff to show the employer's reason is pretextual. Id. (citations omitted). The plaintiff must prove that the employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." Strickland v. Water Works and Sewer Bd. Of City of Birmingham, 239 F.3d 1199, 1207 (citations omitted).

Simpson's claim of engaging in a statutorily protected activity of seeking information about FMLA leave comes from a discussion she had with Jones when she first learned she was pregnant. Simpson asked Jones how to get the maternity leave process started, and Jones responded that it was too early to worry about that and they would do it at a later time. (Doc. 25-1 at p. 6). After this, Simpson did not speak to Jones about FMLA leave again nor did she speak with any other CSL management staff about the leave. (Doc. 21-1 at p. 9).

"[T]he FMLA protects a pre-eligibility request for post-eligibility maternity leave" from retaliation or interference. Pereda v. Brookdale Senior Living Communities, Inc., 666 F.3d 1269, 1275 (11th Cir. 2012). And an employee need only provide "verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c) An employee need not mention the FMLA in their leave request for a qualifying event. (Id.). A request for maternity leave is sufficient to put the employer on notice that she is seeking FMLA leave. And Jones' response that it was "too early to worry about that" indicates that Jones had an understanding of Simpson's eligibility for leave and a timeframe of when the maternity leave would be needed. Therefore, the Court finds that there is sufficient evidence that Simpson engaged in protected activity.

And as for the causal connection between the request and Simpson's termination, the evidence previously discussed in relation to Simpson's pregnancy discrimination claim suffices to withstand summary judgment on the FMLA retaliation claim. Therefore, Summary Judgment on this claim is **DENIED.**

**2. Count III – FMLA Interference Claim**

Employers are prohibited from interfering with an employee's request for leave under the FMLA. 29 U.S.C. § 2615(a)(1). To succeed on a FMLA interference claim, "a plaintiff must prove that she was "denied a benefit to which [she] was entitled under the FMLA."" Lapham v. Walgreen Co., 88 F.4th 879, 895-96 (11th Cir. 2023), cert. denied, 145 S. Ct. 162 (2024). A plaintiff must prove this by a preponderance of the evidence. Strickland, 239 F.3d at 1207. A plaintiff is not required to claim the employer deliberately denied the right because "the employer's motives are irrelevant." Strickland, 239 F.3d at 1208. However, when termination is

the adverse employment action that interfered with the plaintiff receiving a benefit to which they were entitled, "the employer "may defend against a[n] FMLA interference claim by establishing that the employee would have been terminated anyway."" Lapham, 88 F.4th at 896. The employer must show that the employee was terminated for a "wholly unrelated" reason than her request for FMLA leave. Strickland, 239 F.3d at 1208.

Here, the interference of Simpson's FMLA leave is the termination of her employment, so CSL must provide an independent reason for the termination. For reasons previously stated, the Court finds that there are issues of fact to be resolved by a jury as to whether Simpson was terminated for reasons unrelated to her pregnancy and inquiry into available maternity leave.

CSL's Motion for Summary Judgment on this claim is **DENIED.**

### IV. Conclusion

Accordingly, it is **ORDERED** that CSL Plasma's Motion for Summary Judgment is **DENIED.**

**DONE** and **ORDERED** this **22nd day** of **April 2025.**

> /s/ Kristi K. DuBose
> **KRISTI K. DuBOSE**
> **UNITED STATES DISTRICT JUDGE**